UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INDIAN OIL CORPORATION LIMITED

Petitioner,

-v-

DTI FINANCIAL INC. d/b/a DGA ENERGY,

Respondent.

26 Civ. 24 (PAE)

OPINION & ORDER

---

PAUL A. ENGELMAYER, District Judge:

Petitioner Indian Oil Corporation Limited ("IOCL") seeks to confirm a foreign arbitration

award it obtained against respondent DTI Financial Inc. d/b/a DGA Energy ("DTI"). Currently

before the Court is DTI's motion to dismiss, under Federal Rule of Civil Procedure 12(b)(5), for

insufficient service of process.

For the reasons that follow, the Court denies that motion.

## I.     Factual and Procedural Background[1]

### A.     The Parties and Master Purchase Agreement

IOCL is an Indian corporation, owned by the Indian government, which engages in the

purchase of liquefied natural gas. Dkt. 1 ("Petition") ¶ 4. DTI is a New York corporation that

---

[1] This factual account draws on the petition to confirm arbitration, Dkt. 1 ("Petition"), and the declarations filed in connection with the instant motion, *see* Dkts. 5 ("Weldon Decl. I"), 14 ("Gulati Decl. I"), 17 ("Friedland Decl."), 18 ("Weldon Decl. II"), 20 ("Gulati Decl. II"), 21 ("Saghar Decl."), 23 ("Weldon Decl. III").

On a motion to dismiss for insufficient service of process, the Court considers matters outside the pleadings and views "the parties' pleadings and affidavits in the light most favorable to the non-moving party." *Martinez v. SEIU Loc. 32BJ*, No. 18 Civ. 3961, 2019 WL 1259381, at *1 n.1 (S.D.N.Y. Mar. 19, 2019) (cleaned up).

supplies liquified natural gas. *Id.* ¶ 5; Dkt. 5 ("Weldon Decl. I") ¶¶ 5. Deepak Gulati is/was the president, owner, and controlling shareholder of DTI. *See* Dkt. 18 ("Weldon Decl. II") ¶ 8.

On February 2, 2018, IOCL and DTI entered into a framework master sale purchase agreement (the "MSPA"), which set out terms and conditions for the parties' future sale and purchase of liquified natural gas. Weldon Decl. I ¶¶ 6–7. On April 17, 2018, pursuant to the MSPA, the parties entered into a contract that obligated DTI to supply liquefied natural gas to IOCL at an Indian port in June 2018. Petition ¶ 15. In May 2018, DTI informed IOCL that it would be unable to perform its obligations under the contract. Dkt. 5-4 ("Final Award") ¶¶ 77–80.

**B.    Arbitration and Commencement of This Action**

On May 31, 2021, IOCL initiated arbitral proceedings in Singapore, seeking recovery of costs stemming from DTI's alleged breach, legal fees, and interest. Weldon Decl. I ¶ 18; Final Award ¶¶ 46–47. DTI did not participate in those proceedings.[2] Final Award ¶ 10. On January 30, 2023, the arbitral tribunal (the "tribunal") issued a final award in favor of IOCL in the amount of $9,216,722.37, plus legal fees, expenses, and interest. *Id.* ¶ 206(a).

On January 2, 2026, IOCL initiated this action, seeking confirmation of the arbitral award and damages in the amount found by the tribunal. Dkt. 1. On January 28, 2026, DTI moved to dismiss the Petition, pursuant to Rule 12(b)(5), due to insufficient service of process. Dkt. 13 ("Mot."). On February 12, 2026, IOCL opposed. Dkt. 16 ("Opp'n"). On February 19, 2026, DTI replied. Dkt. 19 ("Reply"). On February 27, 2026, IOCL filed a sur-reply. Dkt. 22 ("Sur-Reply").

---

[2] The arbitral tribunal and IOCL made numerous attempts to contact DTI via email and physical mail regarding the arbitral proceedings. *See, e.g.*, Final Award ¶¶ 24–45.

### C.    The Parties' Initial Accounts of Service

The parties' briefs and supporting declarations, submitted in connection with the motion to dismiss, offered divergent accounts of service.

### 1.    IOCL's Account

On January 7, 2026, process server Kyle Friedland, retained by IOCL, attempted to serve Gulati on behalf of DTI at 1148 Fifth Avenue, Suite 1B, New York, New York 10128 ("1148 Fifth"). Dkt. 17 ("Friedland Decl.") ¶ 3. IOCL determined that this was DTI's address based on two sources. First, the MSPA listed 1148 Fifth as DTI's business address. Weldon Decl. I ¶ 5; Dkt. 5-3 ("MSPA") at 65. Second, as of February 3, 2026, DTI maintained an active website for DGA Energy, which stated that its offices were located at 1148 Fifth. Weldon Decl. II ¶¶ 4–6.

In a sworn affidavit dated January 7, 2026, and a declaration dated February 11, 2026, Friedland attested to the following account of service. On January 7, 2026, he arrived at 1148 Fifth and observed that Suite 1B was a "collection of offices." Friedland Decl. ¶ 4. He inferred, based on signage, that these were "mainly for physicians." *Id.* Friedland entered Suite 1B. *Id.* He spoke with the "front desk attendant," who "confirmed that Deepak Gulati was in Suite 1B," but stated that Gulati was in a meeting. *Id.* Friedland asked whether he could meet Gulati to deliver the service documents to him personally, but the attendant stated that Friedland could not because Gulati was in a meeting. *Id.* ¶ 5. The desk attendant had a "further conversation" with another individual, who then came out to speak with Friedland. *Id.* That individual identified herself as "Veeia S.," and represented that she was the office manager. *Id.* Veeia S. stated that she was "authorized to accept service of the Service Documents on behalf of Mr. Gulati." *Id.* Friedland concluded that Veeia S. was an "Authorized Representative" of DTI, and delivered the documents to her. *See id.* ¶ 6; Dkt. 9 ("Friedland Aff.").

3

### 2.     DTI's Account

DTI's account of the events of January 7, 2026 shifted during litigation of this motion.

On January 28, 2026, DTI filed Gulati's first declaration. Dkt. 14 ("Gulati Decl. I"). Gulati stated that he was formerly DTI's president, CEO, and sole shareholder, but that DTI had been dissolved in 2020 and has not maintained operations, a physical office, or any employees since September 2020—six years before the date of alleged service. *Id.* ¶¶ 1–2, 6–7. He further stated, on information and belief, that Veeia S. was a "doorperson" for 1148 Fifth. *Id.* ¶ 12. In support of Gulati's declaration, DTI filed a "copy of the Certificate of Dissolution of D.T.I. Financial Inc." *Id.* ¶ 3; Dkt. 14-1 ("DTI Dissolution Form").

On February 18, 2026, DTI filed Gulati's second declaration. Dkt. 20 ("Gulati Decl. II"). He stated that, "upon further investigation," Friedland's reference to Veeia S. reflected "a misunderstanding of Dr. Veera Saghar's name." *Id.* ¶ 3. Gulati stated that he had never authorized Saghar to accept service on behalf of himself or DTI. *Id.* ¶¶ 4–5.

That same day, DTI filed the declaration from Saghar. Dkt. 21 ("Saghar Decl."). Saghar stated that she works as an egg donor coordinator at Indian Egg Donors, which operates out of Suite 1B at 1148 Fifth. *Id.* ¶¶ 1–2. She stated that she does not work for DTI, is not authorized to accept service on DTI's behalf, and did not at any time represent that she was so authorized. *Id.* ¶ 3. Neither Saghar nor Gulati addressed the relationship between Indian Egg Donors and DTI.

### 3.     IOCL's Response to DTI's Account

Opposing DTI's account, IOCL filed further declarations by its counsel, and supporting documents. Its counsel stated that, at the time of service, DGA Energy maintained an active website that stated its office was located at 1148 Fifth. Weldon Decl. II ¶¶ 4–6; *see* Dkt. 18-3

("DGA Website"). Counsel stated that Gulati is the practice director of Indian Egg Donors, and that Saghar is the donor coordinator of the same. Dkt. 23 ("Weldon Decl. III") ¶¶ 4–5.

IOCL also attached a report from the New York State Division of Corporations, which reflects that, as of February 2026, DTI was listed as an "active" corporation. Dkt. 18-6. IOCL stated that DTI's purported certificate of dissolution, *see* DTI Dissolution Form, is in fact merely a *request* for dissolution, and that there is no support that such was ever filed with the Department of State, nor that DTI attached consent of the Department of Taxation and Finance— both necessary steps in the dissolution process. *See* Opp'n at 7–8 (citing N.Y. Gen. Bus. Law § 1004(a)).

### D.    Evidentiary Hearing Testimony Regarding Service of Process

On April 9, 2026, the Court notified the parties that it would benefit from hearing testimony from Friedland and Saghar regarding the events surrounding the attempted service on January 7, 2026. Dkt. 26. On April 20, 2026, the Court held an evidentiary hearing, during which the Court heard direct and cross-examination of both witnesses, and itself put questions to the witnesses.

The testimony revealed several factual disputes that bear on whether service was proper.[3] The Court distills the pertinent portions of the testimony below in addressing each dispute. The

---

[3] There is a dispute as to whether Friedland delivered the service documents at Suite 1B or Suite 1C at 1148 Fifth. Saghar stated in her sworn declaration that Indian Egg Donors operates out of Suite 1B. Saghar Decl. ¶ 2. At the hearing, she testified that Indian Egg Donors is located in Suite 1B, and that Suite 1C is the office of a separate company, Patients Medical, which is owned by Gulati's wife. Tr. at 45, 51, 59, 62. On cross examination, however, Saghar changed her account. She testified that Indian Egg Donors operates out of Suite 1C and that Patients Medical operates out of Suite 1B; she adhered to that account on questioning by the Court. *Id.* at 61. Friedland, in contrast, stated in both his declaration and his hearing testimony that Suite 1B was the location where he encountered Saghar, where Gulati was said to be present at the time of service, and where Friedland delivered the service documents. Friedland Decl. ¶¶ 4–5; Tr. at 10–12, 29.

Court found Friedland's testimony broadly credible. Saghar's testimony was largely credible as to the physical layout of the offices at 1148 Fifth, but largely not credible as to the details of her interaction with Friedland.

### 1.    Whether There Was Signage for DTI and/or DGA Energy at 1148 Fifth

Friedland testified that he recalled a "plaque or some sort of sign" for DTI and/or DGA Energy in the reception area of Suite 1B. April 20, 2026 Hearing Transcript ("Tr.") at 11–12. He described an "award type of plaque," but testified that he is "not a hundred percent certain on exactly what it was." *Id.* at 30. He testified that he does not recall seeing signage for Indian Egg Donors, but could not "say with certainty." *Id.* at 17. Saghar testified that the reception area of Suite 1B has signage for Indian Egg Donors (which is also known as Surrogacy4All), such as a banner and licenses or certificates on the wall. *Id.* at 52. She stated that there are no signs bearing the names DTI or DGA Energy. *Id.*

The Court finds Saghar's testimony on this point to be the more credible. Saghar has worked at Indian Egg Donors for approximately three years. *Id.* at 68. Friedland, in contrast, spent approximately five minutes in the offices, during which he was focused on his task of delivering the service papers. *See id.* at 26, 30. Because Saghar has far greater familiarity with the office space, the Court accepts her account that the office has signage for Indian Egg Donors and Surrogacy4All, but not for DTI or DGA Energy.

---

The Court does not need to resolve this factual dispute. It is clear from Saghar's testimony that both Suites 1B and 1C are located on the first floor of 1148 Fifth, that there is a lack of signage differentiating the two suites, that Gulati and/or his wife are involved in the businesses operated out of both suites, that mail intended for one suite is often delivered to another, and that visitors often "get confused" between the suites. Tr. at 61, 67, 71–77. Accordingly, regardless whether Friedland in fact went to Suite 1B, it was reasonable for him to conclude that he was there.

### 2. Whether The Names DTI and/or DGA Energy Appeared on the Face of the Service Documents

Friedland testified that the service documents consisted of a 200-page stack of papers held together by a metal binder clip. *Id.* at 9. He stated that the first page of the stack was likely the front of the summons, which displayed the names DTI and/or DGA Energy somewhere in the middle of the page. *Id.* at 31. Saghar testified that she was "100 percent sure" the documents were contained in an envelope, which she recalls was white. *Id.* at 75–76. She testified that she recalls seeing Gulati's name on the documents, and that she "did not even bother to read what else was there." *Id.* at 76. She stated that she did not know whether the name DTI appeared on the envelope. *Id.* at 58.

The Court finds Friedland's account to be more credible on this issue. Friedland has worked as a process server for approximately two years and conveyed familiarity with how service documents generally appear. *Id.* at 25. His testimony is corroborated by the actual summons, on whose front page "DTI Financial Inc. d/b/a/ DGA Energy" appears twice—in the case caption on the top left corner and above the defendant's address in the middle of the page. *See* Dkt. 8 ("Summons") at 1. Saghar's account, in contrast, is undercut by her testimony that she did not inspect the documents and "did not paid [sic] attention" to the names that it listed. Tr. at 57. Accordingly, the Court finds that the documents were held together by a binder clip, and that the names DTI and/or DGA Energy appeared on the face of them.

### 3. Whether Friedland Identified DTI and/or DGA Energy as the Target of Service

Friedland testified that, upon entering Suite 1B, he asked the front desk attendant if "this was [the office] for DTI or DGA Energy," and the attendant confirmed that it was. *Id.* at 13. Friedland testified that he then asked for Gulati, because Friedland "was serving paperwork for the company and [Gulati] would be the one that we have written down as the agent of process."

7

*Id.* Friedland stated that he is "[a] hundred percent confident" that he told the attendant he was there for DTI and/or DGA Energy because he "would never go to serve a business without asking about the (1) business name, and then (2) if there's someone authorized to accept." *Id.* at 28–29. Friedland testified that the attendant then retrieved Saghar, who identified herself as the office manager, but did not specify the company for which she worked. *Id.* at 11. Friedland testified that he asked Saghar whether she was authorized to accept service for DTI and/or DGA Energy, and that he is "[v]ery confident" that he used those terms. *Id.* at 34. He stated that it is his general practice to "explain that it's legal paperwork, that it's being served on whatever company it is or whoever person it is, and . . . [that] it's a summons and complaint, or it's [a] summons and petition." *Id.* at 36. Friedland testified that Saghar replied that she was "authorized to accept process of service [sic] for the company." *Id.* at 11.

Saghar testified that, on January 7, 2026, she was retrieved by a co-worker, who told her that "there is a gentleman who's waiting with the papers, he wants somebody to receive it." *Id.* at 47. She testified that she went to the reception area, and encountered Friedland, who said that he was "waiting for somebody to receive these papers." *Id.* at 48. She testified that she told Friedland that she was the office manager and that she could receive them, and that she then signed the papers. *Id.* She testified that he did not ask whether she was the office manager for DTI and/or DGA Energy. *Id.* at 53. She testified that Friedland did not describe what was in the papers, and that she does not recall whether he said the papers were for Gulati, DTI, or DGA Energy. *Id.* at 50. She further testified that she "do[es] recall he did not mention DTI or any energy company." *Id.* As to whether Friedland asked if she was authorized to accept service of process for DTI, Saghar testified, "I don't remember that, but as far as I remember, I say no." *Id.* Upon further questioning by the Court, Saghar's account shifted, so as now to state that she is

8

certain that Friedland did not reference DTI and/or DGA Energy; she stated that she "would have noticed that," given her unfamiliarity with those names. *Id.* at 79. She testified that she is "not sure" whether Friedland used the word "summons." *Id.* at 80.

The Court finds, for several reasons, that Friedland's testimony is more credible as to whether he identified DTI and/or DGA Energy as the targets of service, and whether he asked Saghar if she was authorized to accept service on behalf of the same. First, Friedland testified that, over some two years as a process server, he has served approximately 100 corporations per week. *Id.* at 25. He testified that it is his consistent practice to identify the "business name" because "[t]hat's the proper way to execute service." *Id.* at 29. The Court thus credits his testimony that, consistent with this general and sound practice, he identified the corporation as the target of service when speaking to Saghar.[4]

Second, Saghar's testimony in this area was, at times, contradictory. She initially stated that she didn't remember whether Friedland asked if she was authorized to accept service for DTI or used the words DTI and/or DGA Energy. *Id.* at 50, 53. Upon further questioning, she stated that she was certain he did not say those words. *Id.* at 79. But she could not remember with similar certainty anything else about the exchange, except that Friedland said "he was looking for somebody who can receive the papers and sign." *Id.* at 78. It is dubious that

---

[4] At the hearing, Tr. at 92, counsel for DTI argued that Friedland's testimony contradicted his declaration, which stated that Saghar "informed me that she was authorized to accept service . . . on behalf of Mr. Gulati." Friedland Decl. ¶ 5. That representation, however, only addressed what Saghar said in response to Friedland. It is not inconsistent with Friedland's testimony that, while in the suite, he identified DTI and/or DGA Energy as the target of service and asked Saghar whether she was authorized to accept on behalf of them, or that Saghar responded in the affirmative. In any event, to the extent that there is a discrepancy between Friedland's declaration and in-court testimony, it is likely due to the fact that, as Friedland testified, the declaration was prepared by the company that employs him as a process server—which was likely inattentive in drafting as to the distinction between DTI/DGA Energy and Gulati. *See* Tr. at 22–23. The Court thus credits Friedland's in-court testimony.

Saghar's memory of events was so clear as to this decisive question, but not as to others, such as whether Friedland mentioned Gulati's name, *id.* at 50, said "what was in the papers," *id.*, or used the word "summons," *id.* at 80. Saghar's bearing and manner in testifying as to these detail also did not inspire confidence in the virtuosity of her recollection.[5] It is much more likely that Friedland, whose job it was to effect service, recalled the details of his interaction with Saghar, who did not have reason to be attentive to the facts surrounding service until well afterwards, when her boss, Gulati, in the course of this litigation, disputed service.

Third, Saghar testified that she was rushed in her interaction with Friedland, which makes it likely that she did not fully hear or understand him. She testified that the interaction was brief because "we all have meetings scheduled back to back," *id.* at 58, and that she "had things to do, so [she] just signed the paper and that was it," *id.* at 89. In addition, as Friedland acknowledged and as the pace of his testimony corroborated, Friedland tends to speak quickly. *Id.* at 34. This combination of factors undermines the reliability of Saghar's testimony as to what Friedland did and did not say.

Accordingly, the Court finds that Friedland identified DTI and/or DGA Energy as the target of service, and asked Saghar whether she was authorized to accept service on behalf of the same.

## II.    Discussion

### A.    Governing Legal Framework

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Dynegy Midstream Servs. v.*

---

[5] Also tending to undermine the reliability of this testimony is that Gulati is Saghar's employer. Saghar acknowledged that Gulati helped prepare her sworn declaration and spoke with her in advance of her testimony. *See* Tr. at 70, 82–83.

*Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006) (citation omitted). "When a defendant challenges service of process, the burden of proof is on the plaintiff to show the adequacy of service." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010) (citation omitted). The plaintiff "must meet this burden by making a prima facie case of proper service 'through specific factual allegations and any supporting materials.'" *Sikhs for Just. v. Nath*, 850 F. Supp. 2d 435, 440 (S.D.N.Y. 2012) (quoting *Kwon v. Yun*, No. 5 Civ. 1142, 2006 WL 416375, at *2 (S.D.N.Y. Feb. 21, 2006)). "Conclusory statements are insufficient to overcome a defendant's sworn affidavit that he was not served." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002) (citation omitted).

"In considering a Rule 12(b)(5) motion to dismiss for insufficient service of process, a court must look[] to matters outside the complaint to determine whether it has jurisdiction." *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016). A court analyzes such a motion by looking to Federal Rule of Civil Procedure 4, which "governs the content, issuance, and service of a summons." *Kelly Toys Holdings, LLC v. Top Dep't Store*, No. 22 Civ. 558, 2022 WL 3701216, at *5 (S.D.N.Y. Aug. 26, 2022) (citation omitted).

Rule 4(h)(1) provides, in relevant part, that a domestic or foreign corporation must be served in a judicial district in one of two ways. Under Rule 4(h)(1)(B), a corporation may be served "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." In the alternative, under Rule 4(h)(1)(A), a corporation may be served "in the manner prescribed by Rule 4(e)(1) for serving an individual," which, in turn, provides for service in accordance with the law of the state where the district court is located.

Under New York law, personal service on a corporation must be made by delivering the summons "to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") § 311(a)(1). A corporation may also be served via the secretary of state. N.Y. Bus. Corp. Law § 306(b)(1).

**B.    Application**

DTI argues that service was improper because Saghar was not an "officer, director, managing or general agent" of DTI, or otherwise authorized to accept service on its behalf. Mot. at 4. IOCL counters that service was adequate because Friedland reasonably relied on the representations of DTI and its employees in concluding that DTI was based in the office located at 1148 Fifth and that Saghar was an authorized agent of DTI. Opp'n at 6. IOCL is correct.

Service of process on a corporation is proper, even when effected on an individual not authorized to accept service, if it, "objectively viewed, is calculated to give the corporation fair notice." *Fashion Page, Ltd. v. Zurich Ins. Co.*, 50 N.Y.2d 265, 272 (1980); *see also OR.EN. Orobia Eng'g S.R.L. v. Nacht*, No. 97 Civ. 4912, 1998 WL 730562, at *5 (S.D.N.Y. Oct. 19, 1998) (courts construe § 311 "very liberally" and uphold service by any means "reasonably calculated to give notice" to corporation (citation omitted)). Here, the Court finds, Friedland reasonably concluded, based on the totality of the circumstances, that service on Saghar was adequate to give DTI notice of the commencement of this suit.

First, Friedland reasonably believed he was present at DTI's offices. Friedland went to the address which was undisputedly listed for DGA Energy both on its then-active website and in the MSPA. Upon his arrival, he confirmed with the front desk attendant that he was, in fact, at the offices of DTI and/or DGA Energy. Tr. at 10. He then asked for Gulati—the president and

CEO of DTI—and was told that Gulati was present in the office, although currently in a meeting. *Id.* Although aspects of the suite, such as the signage for Indian Egg Donors and Surrogacy4All and appearance of physicians' offices, might have called into question the presence of DTI, these could reasonably have been viewed as indicative of an office space shared by DTI and another company. On these assembled circumstances, it was thus reasonable for Friedland to conclude that he was at DTI's office. *See, e.g., Gallery Recording Studios, Inc. v. Discrete Tech. Ltd.*, No. 97 Civ. 4752, 1997 WL 695569, at *1 (S.D.N.Y. Nov. 6, 1997) (corporate defendant "estopped from contesting the propriety of service" at address designated in promotional materials); *Bricklayers Ins. & Welfare Fund v. Sukhmany Constr., Inc.*, No. 13 Civ. 6803, 2014 WL 7335667, at *3 (E.D.N.Y. Dec. 22, 2014) (proper service on corporation through delivery to individual found at address specified in parties' collective bargaining agreement).

Second, Friedland reasonably concluded that Saghar was an authorized agent of DTI. As the Court has found, he asked the front desk attendant who was authorized to accept service for DTI and/or DGA Energy, and was directed to Saghar. Tr. at 14. Friedland told Saghar that he was there to serve documents on DTI and/or DGA Energy, and asked whether she was authorized to accept service on behalf of the same. *Id.* at 19, 34, 38. Saghar told Friedland that she was authorized to receive the service documents. *Id.* at 34. Friedland then handed her the documents—which bore the names DTI and DGA Energy on the front page (which was visible)—and she accepted and signed them. *Id.* at 31; Summons at 1. Because a process server "cannot be expected to know the corporation's internal practices" and may rely on corporate employees to "identify the proper person to accept service," it was reasonable for Friedland to conclude that Saghar was authorized to accept service for DTI. *Fashion Page*, 50 N.Y.2d at 272; *see also Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F. Supp. 201, 205 (S.D.N.Y. 1996)

13

("[I]t is well settled in New York that a process server is entitled to rely upon the representations of an employee who claims to be authorized to receive service of process.").

Courts have found service proper under similar circumstances. For example, in *Fashion Page*, the court found "ample evidence" that the process server acted reasonably in effecting service on an unauthorized employee, where the server "announced his purpose" to serve the summons upon arrival at the offices, relied on a receptionist "to direct him to the appropriate person," and made delivery to that individual after she stated, "I can take it," in response to the question whether she was authorized to accept the service documents. 50 N.Y.2d at 269–70. Similarly, here, Friedland told the front desk attendant that he was there to serve DTI and/or DGA Energy and the attendant directed him to Saghar, who then confirmed that she was authorized to accept service. Friedland Decl. ¶¶ 3–5. As in *Fashion Page*, DTI "cannot be heard to complain that the summons was delivered to the wrong person when the process server has gone to its offices, made proper inquiry of the defendant's own employees, and delivered the summons according to their directions." 50 N.Y.2d at 273; *see also Krape v. PDK Labs Inc.*, 194 F.R.D. 82, 85 (S.D.N.Y. 1999) (service on unauthorized employee proper where process server went to corporation's offices, asked receptionist who was authorized to receive service, and served individual that receptionist identified).

That Saghar was not, in fact, an employee of DTI does not defeat the reasonableness of Friedland's assessment that she was authorized to accept service on behalf of the corporation. *See, e.g., Aguilera v. Pistilli Const. & Dev. Corp.*, 882 N.Y.S.2d 145, 147 (2d Dep't 2009) (service properly effected on employee of corporation that "shared offices with [defendant corporation] and was owned by the same principals"); *DCH Auto Grp. (USA), Inc. v. Fit You Best Auto., Inc.*, No. 5 Civ. 2973, 2007 WL 2693848, at *3–4 (E.D.N.Y. Sept. 12, 2007) (service

14

properly effected on person found at defendant's offices who represented he was authorized to accept but was not, in fact, an employee). Nor, given the multiple contexts in which DTI had affirmatively identified 1148 Fifth as its office address, does DTI's representation that it was not operating out of 1148 Fifth at the time of service carry the day. *See Bricklayers Ins.*, 2014 WL 7335667, at *2 (service proper at office defendants claimed to have vacated year prior because address was designated in collective bargaining agreement as place where notice should be sent and featured on company's letterhead at time of service).[6]

Based on the foregoing, Friedland's delivery of the service documents to Saghar was reasonably calculated to give DTI fair notice. *See, e.g., N.Y.C. Dist. Council of Carpenters Pension Fund v. G & M Drywall Sys. Inc.*, No. 7 Civ. 1969, 2010 WL 2291490, at *11 (S.D.N.Y. June 1, 2010) (corporation "validly served" where "individual who took the papers represented that he had authority to accept them on behalf of the corporation"); *Arbitron, Inc. v. Marathon Media, LLC*, No. 7 Civ. 2099, 2008 WL 892366, at *4 (S.D.N.Y. Apr. 1, 2008); *DCH Auto Grp. (USA), Inc.*, 2007 WL 2693848, at *4; *Fashion Page*, 50 N.Y.2d at 273. Accordingly, the Court denies the motion to dismiss for insufficient service of process.

---

[6] The Final Award stated that, on March 10, 2022, Shellie H. Hart, counsel for DTI, had stated in an email to the tribunal that DTI had been dissolved in September 2020, that dissolution paperwork had been filed with the State of New York, that the company offices were vacated and all employees terminated, and that the proper method to effect service on DTI was accordingly via the New York Department of State. Final Award ¶ 9. However, contrary to that representation, at the time of service, the New York State Division of Corporations reflected that DTI was an active corporation, and the active website for DGA Energy listed its address as 1148 Fifth. It was therefore reasonable, notwithstanding Hart's unsubstantiated claim, for IOCL to pursue service at the address stated in the MSPA.

**CONCLUSION**

For the foregoing reasons, the Court denies DTI's motion to dismiss pursuant to Rule 12(b)(5).  DTI is directed to answer or otherwise respond to the Petition by May 29, 2026.

The Clerk of Court is respectfully directed to terminate the motion pending at docket 12.


SO ORDERED.


                                                        PAUL A. ENGELMAYER
                                                        United States District Judge


Dated: May 8, 2026
       New York, New York